# United States District Court

_____SOUTHERN_____ **DISTRICT OF** _____NEW YORK_____

ANDREW SERRA,

                 Plaintiff

        V.                **SUMMONS IN A CIVIL CASE**

THE NEW YORK CITY DEPT. OF CORRECTIONS;
JOHN BIASI, individually and in his
capacity as Provisionary Stationary     **CASE NUMBER:**
Engineer; LEE NILES, individually and in his
capacity as Supervisor of Mechanics; CARLISE
THOMPSON, individually and in his capacity as
Warden; WILLIAM J. FRASER, individually and in his
capacity as DOC Commissioner; MARTIN F. HORN,
individually and in his capacity as DOC Commissioner;
and the CITY OF NEW YORK. DEFENDANTS.

**05 CV 6591**

**JUDGE BATTS**

TO: (Name and Address of Defendant)
DEFENDANTS DEPT. OF CORRECTIONS, WILLIAM J. FRASER, MARTIN F. HORN, and THE NEW
YORK CITY DEPARTMENT OF CORRECTIONS: 60 Hudson St., 6th flr., NY, NY 10013;
DEFENDANTS JOHN BIASI and CARLISE THOMPSON: Support Services Division Powerhouse,
1616 Hazen Street, East Elmhurst, NY 11370; DEFENDANT LEE NILES: George R. Vernon
Center, 0909 Hazen Street, East Elmhurst, NY 11370; and DEFENDANT CITY OF NEW
YORK: 100 Church Street, New York, New York 10007.

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

KOUSOULAS & ASSOCIATES P.C.

41 MADISON AVENUE, 40th FLOOR
NEW YORK, NEW YORK 10010

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period
of time after service.

J. MICHAEL McMAHON

CLERK

_(BY) DEPUTY CLERK_

DATE     JUL 21 2005

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**05 CV      6591**

------------------------------------------------------------x

ANDREW SERRA,

Plaintiff,

-against-

THE NEW YORK CITY DEPARTMENT
OF CORRECTIONS ("DOC");
JOHN BIASI, individually and in his capacity
as  Provisionary Senior Stationary Engineer of the
DOC; LEE NILES, individually and in his
capacity as Supervisor of Mechanics of the DOC;
CARLISE THOMPSON, individually and in his
capacity as Warden of the DOC; WILLIAM J. FRASER,
individually and in his capacity as Commissioner
of the DOC; MARTIN F. HORN, individually
and in his capacity as Commissioner of the DOC
and THE CITY OF NEW YORK

Defendants.

------------------------------------------------------------x

**COMPLAINT**

JURY TRIAL DEMANDED



Plaintiff, by his attorneys, Kousoulas & Associates P.C., for his Complaint against defendants, alleges the following:

1.      This is a civil rights action for declaratory relief, equitable relief, back pay, front pay, compensatory and punitive damages and other relief, to redress violations of Plaintiff's rights, privileges and immunities under the United States Constitution, as amended, and the Civil Rights Act of 1871, 42 U.S.C. §1983, and to redress acts of discrimination and retaliation against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, 42

1

U.S.C. §2000e et seq., the New York Human Rights Law, as codified in New York Executive Law §290 et seq., Title 8 of the Administrative Code of the City of New York; and the Family and Medical Leave Act of 1993, 29 U.S.C. 2601 et seq.

2.      Plaintiff files this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.; the New York Human Rights Law, as codified in New York Executive Law §290 et seq.; Title 8 of the Administrative Code of the City of New York; the First and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. §§1983, 1988; New York Executive Law §296; New York City Administrative Code §8-107; and the Family and Medical Leave Act of 1993, 29 U.S.C. 2601 et seq.

## Jurisdiction and Venue

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343, 1367(a), and the doctrine of pendent jurisdiction.

4.      Venue is properly laid in the Southern District of New York because a substantial part of the events and omissions giving rise to the claims set forth herein occurred in the Southern District of New York.

5.      The plaintiff timely pursued all applicable administrative remedies. Plaintiff files this action within 90 days of receipt of a Notice of Right to Sue, issued on April 26, 2005 by the United Stated Equal Employment Opportunity Commission.

6.      Plaintiff demands a trial by jury in this action.

**Parties**

7.    Plaintiff, Andrew Serra, is a white male who is a citizen of the United States and resident of the State of New York.  Plaintiff commenced his employment as a an Oiler with the New York City Department of Corrections (hereinafter "Department of Corrections" or "DOC") in May of 2000.

8.    Defendant John Biasi, ("Biasi"), at all times relevant herein, served as Provisionary Senior Stationary Engineer of the SSD Powerhouse facility of the DOC and, as such, was a policy-maker with respect to policies, practices and customs of the DOC, including the DOC's employment practices.  Defendant Biasi is sued in his individual and official capacities.

9.    Defendant Lee Niles, ("Niles"), at all times relevant herein, served as the Supervisor of Mechanics at the George R. Vernon Center ("G.R.V.C.") facility of the DOC and, as such, was a policy-maker with respect to policies, practices and customs of the DOC, including the DOC's employment practices.  Defendant Niles is sued in his individual and official capacities.

10.    Defendant Carlise Thompson, ("Thompson"), at all times relevant herein, served as the Warden of the G.R.V.C. facility of the DOC and, as such, was a policy-maker with respect to policies, practices and customs of the DOC, including the DOC's employment practices. Defendant Thompson is sued in his individual and official capacities.

11.    Defendant William J. Fraser, ("Fraser"), served as the Commissioner of the DOC until the end of 2002 and, as such, was a policy-maker with respect to policies, practices and customs of the DOC, including the DOC's employment practices.  Defendant Fraser is sued in his individual and official capacities.

3

12.    Defendant Martin F. Horn, ("Horn"), served as the Commissioner of the DOC from January of 2003 onwards and, as such, is a policy-maker with respect to policies, practices and customs of the DOC, including the DOC's employment practices. Defendant Fraser is sued in his individual and official capacities.

13.    Defendant City of New York is a municipality organized and existing under the laws of the State of New York. At all relevant times hereto, defendant City of New York, acting through the DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the appointment, training, supervision, and conduct of all DOC personnel. In addition, at all relevant times, defendant City of New York was responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel upheld the Constitution and laws of the United States and the State of New York.

14.    Defendant NEW YORK CITY DEPARTMENT OF CORRECTIONS is an agency of defendant City of New York and is plaintiff's former public employer.

**Facts**

15.    Plaintiff commenced his employment with the DOC in May of 2000 as an Oiler. He was assigned to the G.R.V.C facility. His duties and responsibilities as a DOC Oiler consisted of restoring oiling and pipeline equipment at G.R.V.C., installing and maintaining pneumatic controls within the heating systems and creating quality and temperature control systems. Plaintiff was also responsible for the operation, maintenance and repair of the facility's mechanical equipment.

16.    During plaintiff's employment with the DOC, he performed his duties in a satisfactory, if not

4

exemplary manner.  Plaintiff received numerous commendations for his work performance, inc 'Employee of the month' award in March of 2002.

17.  Initially, plaintiff was supervised by Larry Vann, ("Vann"), who is white, held the title of Supervisor of Mechanics and was the main supervisor at the G.R.V.C. As the Supervisor of Mechanics, Vann was responsible for overseeing the maintenance of the G.R.V.C. facility, and had supervisory authority over all the G.R.V.C. staff.  In or about September, 2003, Lee Niles ("Niles"), an African American, replaced Vann as plaintiff's supervisor.

18.  At all times relevant herein until the end of 2002, plaintiff's brother, Anthony Serra, was a Bureau Chief at DOC. Anthony Serra was also an active consultant for the Republican Party, charged with overseeing ballot security.

19.  Upon information and belief, Biasi and others believed that plaintiff wielded a great deal of influence at DOC because of his relationship to Anthony Serra.

20.  In 2002, for example, Biasi asked plaintiff to seek Anthony Serra's influence to help Biasi obtain the position of Deputy Commissioner in Civilian Maintenance.  Plaintiff refused Biasi's request.

21.  In October of 2002, the DOC hired Steve Colletti, ("Colletti"), as a Stationary Engineer. Colletti was assigned to the G.R.V.C. facility, and was charged with operating and maintaining the G.R.V.C.'s mechanical equipment.  Repair work was not part of Colletti's job description.

22.  Upon information and belief, Biasi interviewed and hired Colletti.

23.  In or about October of 2002, plaintiff's brother Anthony Serra was accused of engaging in

5

unlawful and fraudulent activities. Specifically, it was alleged that Anthony Serra had arranged and instructed DOC subordinates to perform work on his private residence, and remunerated their efforts with New York City funds. Pursuant to the allegations, which were reported in various State and local newspapers, Anthony Serra was demoted and he ultimately resigned soon thereafter.

24. Between October, 2002 and April, 2003, numerous excerpts of newspaper articles reporting on the alleged wrongdoings of plaintiff's brother, Anthony Serra, were placed amongst plaintiff's personal belongings at work, on his car at home and in the parking lot of the G.R.V.C. facility.

25. In or about November of 2002, plaintiff was interviewed for the position of Supervisor of Mechanics at the G.R.V.C. facility in connection with two vacancies in that position. Division Manager Tommy Burke ("Burke") recommended plaintiff and two other individuals for the vacancies. Plaintiff was denied the promotion, despite the fact that Burke informed plaintiff that he was the most qualified for the position. Upon information and belief, plaintiff was not promoted to the Supervisor of Mechanics position because of his relationship to his brother, Anthony Serra. Upon information and belief, First Deputy Commissioner Lanagan informed Burke that plaintiff could not be promoted to the position "due to the scandal with his brother."

26. Soon after the much-publicized allegations regarding Anthony Serra's purportedly improper and unlawful conduct, Biasi, while assigned to the SSD Powerhouse, asked Colletti questions regarding plaintiff's work performance and working relationship with his co-workers at the G.R.V.C. facility on a regular basis.

6

27. Upon information and belief, Biasi, by inquiring about plaintiff's work performance, overreached his authority as a Provisional Senior Stationary Engineer at the SSD Powerhouse. Biasi had no supervisory authority over plaintiff or any other individual at the G.R.V.C. facility, as he was only a supervisor at the SSD Powerhouse facility.

28. In November of 2002, plaintiff and Colletti inspected the 200 Annex and the 300 Annex areas in the basement of the G.R.V.C. The piping in the 300 basement had become dislodged, causing steam to be released. Plaintiff proceeded to the 300 Annex to help repair the dislodged pipe, and reported the emergency to the SSD Powerhouse. Upon further investigation, the dislodged pipe was found to be undamaged, and it appeared to have been tampered with. Colletti incurred several hours in overtime repairing the piping system. Plaintiff suspected that Colletti tampered with the pipe to incur overtime.

29. On Christmas Day of 2002, plaintiff and Colletti were scheduled to work at the G.R.V.C. When plaintiff reported to work at the facility, he observed Colletti positioned close to a maintenance supply locker, which was normally locked. The locker had been forced open, and various items had been removed from the maintenance supply locker. Plaintiff suspected that Colletti had opened the locker with a hammer. When plaintiff asked Colletti if he had used a key to open the locker, Colletti responded, "this is a universal key" referring to the hammer in his hand. Concerned about the misappropriation of DOC property, plaintiff reported the incident to Vann. Specifically, plaintiff conveyed his suspicions that Colletti was usurping DOC property.

30. In January of 2003, plaintiff was called to inspect the heating systems at the G.R.V.C. facility. Despite the fact that the heating system had recently been installed with heat

exchanger controllers and other new parts, the temperature of the G.R.V.C. facility had dropped below the required minimum temperature set forth by the DOC rules and regulations, posing a risk to the health and safety of inmates.   Colletti was the only maintenance worker assigned to work at the G.R.V.C. facility that day.   When plaintiff asked Colletti how the drop in temperature occurred, Colletti informed plaintiff that there was nothing wrong with the heating system, showing plaintiff an air filter which he had earlier removed from the system, and an air hose which had been tied in a knot.   Colletti then said to plaintiff, "I just wanted to see who Central Control would call in [to repair the heating system], I am the building engineer."   Concerned about Colletti's obvious misconduct and disregard for the rules and regulations of the DOC, and the possible impact that such activities could have on the health and safety of the G.R.V.C. facility inmates, plaintiff reported the incident to Vann.   Plaintiff told Vann that  he suspected that Colletti was responsible for the drop in temperature in the G.R.V.C. facility, which had decreased below the required minimum temperature set forth by the DOC rules and regulations.   Plaintiff also reiterated that if the problem had not been fixed, the prison inmates would have to be transferred an alternative location, as per DOC rules and regulations, at great expense to the DOC.

31.   Upon information and belief, Colletti was deliberately tampering with the heating and piping systems at the G.R.V.C. in order to incur additional hours of work in overtime.

32.   Soon thereafter, in reprisal for plaintiff's complaints regarding his alleged equipment tampering, Colletti issued plaintiff a number of work orders requiring plaintiff to perform mundane tasks in an attempt to limit plaintiff's involvement with the technical aspects of the

facility.

33. Plaintiff continued to report evidence of tampering with the G.R.V.C. equipment into the facility engineering logbook, which was used by DOC employees as a means of notifying co-workers of work performed and problems encountered at the facility. The supervisors of the G.R.V.C. facility reviewed the logbook entries for problems encountered by the DOC maintenance staff.

34. In April of 2003, Vann requested a meeting with plaintiff and Colletti, after he discovered that Colletti had issued plaintiff with work orders to perform tasks that were not commensurate with his experience.

35. During the meeting, Colletti acted in a confrontational manner and asked plaintiff why he appeared to have disassociated himself from him. Plaintiff informed Colletti, in Vann's presence, that he tried to disassociate himself from him Colletti since the November 2002 incident involving the damaged piping system. Plaintiff stated that he opposed Colletti's attempts to tamper with the facility equipment for the purposes of improperly incurring additional hours in overtime.

36. Upon information and belief, Colletti, Biasi and Warden Thompson had a meeting one month later in May, 2003, wherein Biasi and Colletti alleged that plaintiff was not performing his duties in accordance with the standards set forth by the DOC. As a result of these allegations, Assistant Bureau Chief Caroline Thomas requested that G.R.V.C. Warden Roger Slattery provide her with a copy of plaintiff's tasks and standards sheet, a document in which G.R.V.C. employees recorded their adherence to DOC rules and regulations. Plaintiff had fully complied with DOC rules and regulations.

37.   Beginning in or about May of 2003, and continuing for a number of months, plaintiff received harassing telephone calls to his home.  Intimidating postcards were also sent to plaintiff's home and work address, on which harassing comments were written, including: "Kiss and make up?," "Brothers stand up for each other,""More phone calls, more charges," and "Brace Yourself."   Upon information and belief, these actions were motivated by plaintiff's complaints regarding Colletti's tampering with the G.R.V.C. equipment.

38.   Also in May, 2003, Biasi and Colletti had a meeting with Local 30 union representative Robert Massio ("Massio").  After the meeting, Massio refused to accept plaintiff's Local 30 membership initiation fee.  Upon information and belief, Biasi was fully aware of plaintiff's complaints against Colletti at that time.

39.   In June, 2003, plaintiff went to the SSD Powerhouse, where Biasi was stationed, and questioned him about the allegations that had previously been made against him and to inform him of the incidents that occurred in the G.R.V.C. facility involving Colletti.  Plaintiff also informed Biasi that he recognized some handwriting in the daily logbook at the G.R.V.C. facility as being the same as that on the postcards that were previously sent to plaintiff's home and workplace, and that he suspected that Colletti had sent the postcards to him.  Several days later, the logbook disappeared from the G.R.V.C. facility.

40.   In July, 2003, plaintiff gave photocopies of the postcards to Vann, explaining that they had been sent to his home and workplace.  Shortly thereafter, Investigator Crispo ("Crispo") from the Inspector General's Office summoned plaintiff to his office for a meeting.  During the meeting, he questioned plaintiff about the postcards that were sent to his home.  Crispo then questioned plaintiff about allegations that plaintiff had been receiving "kickbacks" during

his tenure at the DOC. Plaintiff denied the allegations. The allegations against plaintiff were deemed to be unfounded. During the meeting, plaintiff informed Crispo of Colletti's efforts to incur overtime by engaging in improper and unlawful actions at the G.R.V.C. facility. Specifically, plaintiff explained that as a result of Colletti's actions, the prison inmates had been deprived of adequate heat and hot water, and that the temperature had dropped below the standards set forth in the DOC rules and regulations, posing the risk of great expense to the DOC if the problem was not solved.

41.   In August, 2003, further to an investigation of plaintiff's allegations, Colletti was transferred from the G.R.V.C. facility. He was replaced at G.R.V.C. by Steve Winowski ("Winowski"), who is white.   On Winowski's first day at work, Biasi summoned him to the SSD Powerhouse for a meeting with Colletti, Warden Thompson and Larry Vann. During the meeting, Colletti and Biasi attempted to malign plaintiff and his work performance to Vann.

42.   In or about September of 2003, Lee Niles, ("Niles"), who is African American, replaced Larry Vann, who is white, as the Supervisor of Mechanics at the G.R.V.C., after an incident in which the G.R.V.C. facility's water supply was inadvertently shut down.

43.   Soon after Niles' arrival, plaintiff informed Niles of Biasi and Colletti's improper actions with respect to the G.R.V.C. facility. Plaintiff explained to Niles that Biasi was overreaching his authority as a Provisionary Senior Stationary Engineer at the SSD Powerhouse by inquiring about plaintiff's work performance, and also fully described the incidents in which plaintiff suspected Colletti had engaged in improper and unlawful activity, depriving the prison inmates of necessary resources, impacting their health and safety and compromising the G.R.V.C's adherence to DOC rules and regulations. Plaintiff also informed him of the

11

false allegations that were being made against plaintiff. Niles stated that he would speak to Biasi and resolve the situation.

44.     In October of 2003, as part of a departmental schedule change, the DOC removed the 'Gate I' entry passes from the maintenance workers employed at the G.R.V.C facility, and changed the tours of duty of various maintenance staff from 6:00 a.m. through 2:00 p.m., to 7:00 a.m. through 3:00 p.m. Gate I entry passes granted the employees direct automobile access to Riker's Island, where the SSD Powerhouse was located. Plaintiff complained to the personnel department that the tour of duty change prevented him from being able to carry out certain obligations to his children, including collecting them from school each day. As a result, plaintiff's tour of duty was changed back to the original time of 6:00 a.m. through 2:00 p.m.

45.     Upon his appointment, Niles embarked on a course of conduct intended to replace white employees holding various titles at G.R.V.C. with African American employees. Niles appointed a number of African American employees at the G.R.V.C. to replace white workers who were either transferred away from the G.R.V.C. or whose employment with the DOC had ended. Specifically, Niles arranged for the transfer of three African American individuals to the G.R.V.C. and assigned them to do the work of white individuals who previously held the positions of Locksmith, Electrician, Engineer and Plumber and Oiler, positions that routinely incurred overtime. These African American workers at the facility were working out of title, and were being provided with opportunities for overtime, which were denied to white employees at the G.R.V.C., including plaintiff, Steve Winowski, Charles Honig, Steve Katzman, Al Vignolla, ("Vignolla"), Rick Levin and Desmond

12

Connelly.   Vignolla made two complaints regarding the fact that the African American employees were working out of title and provided opportunities for overtime, that were otherwise denied to white employees.   Upon information and belief, defendants took no corrective or remedial action.

46.   Soon after his appointment to the G.R.V.C., Niles prevented the plumbing and engineering staff, all of whom are white, from participating in certain pre-approved overtime programs and project work and instead provided the African American employees with these opportunities.

47.   In November, 2003, Niles handed plaintiff a stack of work orders, setting forth the repair or maintenance work that remained outstanding in the facility, and requested that plaintiff sign the orders as having been completed.   Plaintiff did as Niles requested, assuming that the work had been completed as his supervisor informed him.

48.   Soon thereafter, plaintiff observed that Winowski and Sean Hamid, ("Hamid"), who held the position of Oiler at G.R.V.C., were altering the work schedules of the Oilers and Engineers so that they would be scheduled to work on public holidays, for which they would receive holiday pay.   Plaintiff also noticed that work orders were being signed indicating that work had been completed, when in fact it had not.

49.   Upon information and belief, Niles and the other individuals who were responsible for improperly closing the work orders sought to reduce their workload and give the impression of an improved performance outlook prior to an upcoming DOC Team Organizational meeting.

50.   In December, 2003, plaintiff informed Niles that Winowski and Hamid had altered work

13

schedules in order to work on holidays and incur holiday pay.

51.   In December of 2003, plaintiff contacted the DOC Equal Employment Opportunity ("EEO") Officer Hardville, and stated that he wished to file a complaint.

52.   In January, 2004, plaintiff worked as the Acting Supervisor of Mechanics while Niles was away from work because of a death in his family.  Upon information and belief, plaintiff was recommended for the 'Employee of the Month" award for December, 2003, but did not receive it.  Plaintiff was then told that he would receive the January, 2004 "Employee of the Month" award, but again he did not receive it.  Instead, Mike Hinton, who is African American, received the award.  Caroline Starr, an Administrative Secretary for the DOC, later informed plaintiff that Niles interfered and prevented plaintiff from receiving the award.

53.   On January 25, 2004, plaintiff wrote a letter to Niles regarding the improper alterations to work schedules and work orders, which amounted to a theft of public funds.  Plaintiff hand delivered the letter to Niles, and at the same time complained in person once more about the above issues.  In his January 25, 2004 letter, amongst other things, plaintiff complained to Niles about a number of incidents when Hamid and Winowski were improperly incurring overtime and altering work schedules so that they would work on public holidays, incurring extra pay.  Plaintiff stated, "...the schedule was changed one week before the holiday, allowing the [facility's] two Oilers and Facility Engineer to all be in on the holiday.  This is not normal practice."  Plaintiff also stated, "phone calls were being made [about the change of work schedules] outside the facility to [Biasi] who has no authority to set policy of the administration of G.R.V.C."(emphasis added).  A copy of the letter was sent to Deputy Warden John McClusky and to Tommy Burke, a supervisor at G.R.V.C.   A copy was also

14

sent via interdepartmental mail to Bureau Chief Jacqueline Andrews, who was responsible for Environmental Health and Safety at DOC.

54.   Later that day, Niles altered plaintiff's tour of duty, requiring him to work on both Saturdays and Sundays, altering his previous schedule in which he worked on only one day every weekend. Niles also reverted plaintiff's tour of duty to 7:00 a.m. through 3:00 p.m., despite the fact that plaintiff had sought a hardship waiver regarding that tour due to his child care responsibilities. Plaintiff informed Niles that he intended to speak to Deputy Warden John McClusky and explain the circumstances leading up to the tour change. In response, Niles stated, "If you do that, one of us will not be here." Plaintiff then asked Niles, "Is this because I am white, because of my brother Anthony, or because I complained about those work orders?" to which Niles did not respond. Ultimately, plaintiff's tour of duty was not changed at that time.

55.   On January 26, 2004, the following day, as plaintiff walked past Niles in the G.R.V.C. facility, Niles slammed the maintenance office door shut in front of plaintiff. Immediately thereafter, plaintiff experienced shortness of breath and pains in his chest. Plaintiff saw a physician and was unable to attend work the next day.

56.   While plaintiff was away from work, Al Vignolla the G.R.V.C. facility Locksmith, informed plaintiff that he had been transferred to the SSD Powerhouse facility on Rikers Island, effective immediately, and that Niles and Thompson made the decision to transfer plaintiff.

57.   When plaintiff returned to the G.R.V.C. facility to collect his personal belongings, his former co-workers quipped, "Serra has been banished from the building." When plaintiff reported to the SSD Powerhouse facility, Biasi shouted to plaintiff, "over here, you will do as

everybody else does." There was no legitimate need to transfer plaintiff to the SSD Powerhouse facility, as other employees had already requested to transfer there.

58.     Plaintiff's notice of transfer to the SSD Powerhouse facility was effectuated on "an expedited basis." Plaintiff's transfer detrimentally affected his employment within DOC. As a result of the transfer, plaintiff was completely denied opportunities for overtime. Plaintiff was also subjected to random changes in the times of his tours of duty notwithstanding his prior notices to DOC regarding his child care responsibilities, and he was the only maintenance employee at the SSD Powerhouse facility who was not provided with a 'Gate I Pass' to gain access to the facility.

59.     The transfer to the SSD Powerhouse also resulted in a loss of seniority in plaintiff's employment at the DOC. At the G.R.V.C., plaintiff held the position of Oiler and at times, Acting Supervisor of Mechanics. At the SSD Powerhouse facility, plaintiff no longer held supervisory responsibilities. In fact, plaintiff was the least senior maintenance employee at the SSD Powerhouse. Plaintiff's lack of seniority resulted in less opportunities to select his tour of duty schedule each week. Upon information and belief, an African American individual replaced plaintiff as Acting Supervisor of Mechanics at the G.R.V.C. facility.

60.     On February 10, 2004, plaintiff's first day at the SSD Powerhouse facility, plaintiff met with the Department of Investigations ("DOI"). Biasi handed plaintiff the confirmation slip in connection with his appointment with the DOI. In the meeting, plaintiff informed the DOI of: 1) the improper and unlawful actions of Colletti, Biasi and Niles with respect to the tampering of facility equipment and the alteration of work schedules to incur overtime; 2) the retaliatory treatment to which plaintiff was subjected for complaining about these

16

unlawful and improper practices; 3) the discriminatory treatment he suffered on the basis of his race; 4) the retaliatory treatment he suffered because of his relationship to his brother, Anthony Serra.

61.  On March 15, 2004, plaintiff filed a written complaint with the DOC EEO Office, alleging, inter alia, that he had been transferred against his will and subjected to various other acts of discrimination because of his race, and retaliation for opposing the improper and unlawful actions of various DOC employees, and because of his relationship to his brother, Anthony Serra.  Plaintiff also complained that Niles had referred to two employees as "Whining Jews."

62.  Upon information and belief, Hardville provided a copy of the complaint to the Maintenance Department, despite the fact that Niles, who was the subject of a number of allegations in plaintiff's March 15, 2004 complaint, is the supervisor of that department.

63.  On or about March 19, 2004, plaintiff left work because he was experiencing extreme stress and pain in his chest area.  Upon his return to work on March 29, 2004, Biasi informed plaintiff that he was not permitted to work without producing a note from his doctor explaining his absence.  Assistant Deputy Warden O'Connor later stated that plaintiff could return to work only if he provide a note from his doctor the following day.  Plaintiff provided the medical documentation to O'Connor later that day, which noted that plaintiff was absent from work because he was under a great deal of stress and anxiety.

64.  On April 5, 2004, there was a power-outage at the SSD Powerhouse facility, depriving all the Rikers Island correctional facilities of heat, hot water and electricity.  The loss of power occurred because a switch had been tampered with.  The resulting repair work incurred

overtime for the engineers at the SSD Powerhouse facility.  According to DOC rules and regulations, the incident should have been reported to the DOI or the Inspector General's office.  Plaintiff, concerned about the improper and unlawful activities that led to the loss of power at the Powerhouse, reported the incident to the DOI.  Plaintiff informed the DOI Investigator that the control equipment at the Powerhouse had been tampered with, causing the loss of power, and that the tampering had been done to incur overtime.

65.  Plaintiff informed his co-workers that he was leaving work to report the incident to the DOI. Upon information and belief, plaintiff's supervisors at the SSD Powerhouse facility were aware of plaintiff's complaint to the DOI regarding the April 5, 2004 incident.

66.  Shortly thereafter, plaintiff completed the daily 'sign-in' sheet at the SSD Powerhouse facility incorrectly.  Plaintiff was directed to go to Biasi's office to explain the error which he made on the sign-in sheet, and which other employees routinely made.  Biasi, in the presence of Chief Engineer James McGovern, admonished plaintiff for the error and shouted: "You are going to do exactly what everybody else does!"

67.  After complaining to the DOI, and the filing of his compliant with the DOC EEO office, plaintiff was subjected to retaliatory treatment, which included excessive scrutiny in the performance of his work. On March 29, 2004, soon after being reprimanded by Biasi, plaintiff suffered an anxiety attack as a result and was unable to return to work the following day.  That same day, he had been scheduled to meet with DOC's EEO officer to give testimony in relation to the EEO complaint of Charles Honig alleging that Niles had referred to two employees as "Whining Jews."  The meeting was canceled by the EEO Investigator, without explanation.

18

68.    On April 9, 2004, plaintiff was discussing the fact that he was not provided with the 'Employee of the Month' awards for December, 2003 and January, 2004 with a co-worker in the office of Mr. Leary, Station Engineer at the SSD Powerhouse facility.  Mr. Leary overheard the conversation and shouted loudly: "You are not qualified to even be doing this job.  Get out of this office!"

69.    Immediately thereafter, plaintiff complained about the above incident to Assistant Deputy Warden O'Connor, but he refused to investigate the matter and simply instructed plaintiff to return to work.  Plaintiff also completed a work incident report, which he sent to the Support Services office of DOC, and which he copied to his attorney.

70.    Also on April 9, 2004, John Biasi approached plaintiff and instructed that plaintiff "stop making complaints" with the Department of Corrections.

71.    Soon thereafter, due to the stress that plaintiff was experiencing at work, plaintiff was taken to hospital by ambulance, where he stayed for two days after having difficulty breathing, feeling light headed and experiencing pain in his chest area.  Plaintiff did not return to work the following week.

72.    On or about April 12, 2004, the Personnel Department of the SSD Powerhouse facility contacted plaintiff and informed him that DOC considered him to be 'absent without leave' (AWOL), notwithstanding that DOC was on notice of his hospitalization.

73.    During the week of April 12, 2004, plaintiff made several attempts to contact the SSD personnel department to complain about the discriminatory and retaliatory treatment to which he had been subjected.  Plaintiff eventually voiced concerns to O'Connor about the fact that DOC considered plaintiff to be AWOL, who again refused to investigate or take any remedial

19

action.

74.     On April 24, 2004, plaintiff wrote to Alan Vengersky, ("Vengersky"), Assistant
        Commissioner of the New York City Department of Corrections, explaining that he had been
        hospitalized and requesting leave pursuant to the Family and Medical Leave Act, as his
        accrued sick leave had been exhausted.  Plaintiff received no response from Vengersky
        further to his correspondence of April 24, 2004.

75.     On or about April 24, 2004, plaintiff contacted C.A.R.E., a personnel relations unit at DOC,
        and requested that they provide him with the contact details of a psychiatrist from whom
        plaintiff could receive treatment.  The personnel within C.A.R.E. directed plaintiff to Robert
        Benson, Vengersky's Assistant at DOC.  Plaintiff explained to Benson that he needed to be
        granted additional sick leave days pursuant to the Family and Medical Leave Act. Benson
        denied plaintiff's request and refused to take any investigative or remedial action, stating that
        plaintiff should direct his complaints to the SSD Powerhouse facility.

76.     On May 3, 2004, plaintiff was compelled to resign from his position as Oiler for the New
        York City Department of Corrections.  Plaintiff was no longer capable of working while
        being subjected to a hostile work environment, and ongoing retaliation and racial
        discrimination.

77.     Plaintiff was constructively discharged and his career at DOC effectively ended on May 3,
        2004.

## FIRST CLAIM FOR RELIEF

78. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "77" as if fully set forth herein.

79. Defendants subjected plaintiff to a hostile work environment and discriminated against plaintiff in the terms and conditions of his employment because of his color and race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.

80. As a direct and proximate result of defendants' actions, plaintiff suffered and continues to suffer actual damages, including but not limited to lost income, lost future earnings and mental anguish pain and suffering.

## SECOND CLAIM FOR RELIEF

81. Plaintiff repeats and realleges paragraphs each and every allegation contained in paragraphs "1" through "80" as fully set forth herein.

82. Defendants, including defendants Niles and Thompson, subjected plaintiff to a hostile work environment and discriminated against plaintiff in the terms and conditions of his employment because of his race, in violation of New York Executive Law §290 et seq.

83. As a direct and proximate result of defendants' actions, plaintiff suffered and continues to suffer actual damages, in forms including but not limited to lost income, lost future earnings and mental anguish pain and suffering.

21

## THIRD CLAIM FOR RELIEF

84.     Plaintiff repeats and realleges paragraphs each and every allegation contained in paragraphs "1" through "83" as fully set forth herein.

85.     Defendants, including defendants Niles and Thompson, subjected plaintiff to a hostile work environment and discriminated against plaintiff in the terms and conditions of his employment because of his race, in violation of Title 8 of the Administrative Code of the City of New York.

86.     As a direct and proximate result of defendants' actions, plaintiff suffered and continues to suffer actual damages, in forms including but not limited to lost income, lost future earnings and mental anguish pain and suffering.

## FOURTH CLAIM FOR RELIEF

87.     Plaintiff repeats and realleges paragraphs each and every allegation contained in paragraphs "1" through "86" as fully set forth herein.

88.     Defendants subjected plaintiff to retaliation because of his opposition to the discriminatory practices of defendants and because he filed and pursued charges of discrimination against defendants with the DOC EEO, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.

89.     As a direct and proximate result of defendants' actions, plaintiff suffered and continues to suffer actual damages, in forms including but not limited to lost income, lost future earnings and mental anguish pain and suffering.

## FIFTH CLAIM FOR RELIEF

90.   Plaintiff repeats and realleges paragraphs each and every allegation contained in paragraphs "1" through "89" as fully set forth herein.

91.   Defendants subjected plaintiff to retaliation because of his opposition to the discriminatory practices of defendants and because he filed and pursued charges of discrimination against defendants with the DOC EEO, in violation of Title 8 of the New York City Administrative Code.

92.   As a direct and proximate result of defendants' actions, plaintiff suffered and continues to suffer actual damages, in forms including but not limited to lost income, lost future earnings and mental anguish pain and suffering.

## SIXTH CLAIM FOR RELIEF

93.   Plaintiff repeats and realleges paragraphs each and every allegation contained in paragraphs "1" through "92" as fully set forth herein.

94.   Defendants subjected plaintiff to retaliation because of his opposition to the discriminatory practices of defendants and because he filed and pursued charges of discrimination against defendants with the DOC EEO, in violation of New York Executive Law §290 et seq.

95.   As a direct and proximate result of defendants' actions, plaintiff suffered and continues to suffer actual damages, in forms including but not limited to lost income, lost future earnings and mental anguish pain and suffering.

## SEVENTH CLAIM FOR RELIEF

96.   Plaintiff repeats and realleges paragraphs "1" through "95" as if the same were fully set forth at length herein.

97.   Defendants transferred plaintiff, relieved him of all supervisory responsibility and authority, deprived him of overtime opportunities, subjected him to a hostile work environment, and constructively discharged him solely on the basis of his exercise of his First Amendment rights, and thus deprived plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, the First Amendment to the United States Constitution, and conspired among themselves to do so, taking numerous steps in furtherance thereof, and failed to prevent one another from doing so.

98.   All individual defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment. Said acts by defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, wantonly and knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the First Amendment to the United States Constitution.

99.   Moreover, at all times relevant to this complaint, defendants were policy-makers acting on behalf of defendant City of New York and with full authority to make policy with respect to the treatment of their immediate employees. Accordingly, defendants actions were taken pursuant to official policy, practice and custom.

100.   As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff suffered and continues to suffer actual damages, in forms including but not limited to lost income, lost future earnings and mental anguish pain and suffering.

### EIGHTH CLAIM FOR RELIEF

101.   Plaintiff repeats and realleges paragraphs "1" through "100" as if the same were fully set forth at length herein.

102.   Defendants transferred plaintiff, relieved him of all supervisory responsibility and authority, deprived him of overtime opportunities, subjected him to a hostile work environment, and constructively discharged him because of his race, and thus deprived plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, the First Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and conspired among themselves to do so, taking numerous steps in furtherance thereof, and failed to prevent one another from doing so.

103.   All individual defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment. Said acts by defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, wantonly and knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the First Amendment to the United States Constitution.

104.   Moreover, at all times relevant to this complaint, defendants were policy-makers acting on behalf of defendant City of New York and with full authority to make policy with respect to the treatment of their immediate employees. Accordingly, defendants actions were taken pursuant to official policy, practice and custom.

105.   As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff suffered and continues to suffer actual damages, in forms including but not limited to lost income, lost future earnings and mental anguish pain and suffering.

**NINTH CLAIM FOR RELIEF**

106.   Plaintiff repeats and realleges paragraphs "1" to "104" as if the same were fully set forth at length herein.

107.   The First Amendment to the United States Constitution prohibits state actors from singling out persons for unequal treatment as compared to others similarly situated if the unequal treatment is based on impermissible considerations such as the intent to inhibit or punish the exercise of their right of association.

108.   Defendants transferred plaintiff, relieved him of all supervisory responsibility and authority, deprived him of overtime opportunities and subjected him to other personnel actions, constructively discharged him on the basis of his association with a member of his family, and that member's active involvement in a major political party, and thus deprived plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United

States Constitution, and conspired among themselves to do so (taking numerous steps in furtherance thereof), and failed to prevent one another from doing so.

109.   All individual defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment. Said acts by defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, wantonly and knowingly, and with the specific intent to deprive plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the First and Fourteenth Amendments to the United States Constitution.

110.   Moreover, at all times relevant to this complaint, defendants were policy-makers acting on behalf of defendant City of New York and with full authority to make policy with respect to the treatment of their immediate employees. Accordingly, defendants' actions were taken pursuant to official policy, practice and custom.

111.   As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff suffered and continues to suffer actual damages, in forms including but not limited to lost income, lost future earnings and mental anguish pain and suffering.

**TENTH CLAIM FOR RELIEF**

112.   Plaintiff realleges paragraphs "1" to "110" as if fully set forth herein.

113.   The Fourteenth Amendment to the United States Constitution prohibits state actors from singling out persons for unequal treatment as compared to others similarly situated if the unequal treatment is based on impermissible considerations such as the intent to inhibit or punish the exercise of constitutional rights or the malicious bad faith intent to injure.

114.   Defendants transferred plaintiff, relieved him of all supervisory responsibility and authority, deprived him of overtime opportunities and subjected him to other personnel actions, constructively discharged him on the basis of his exercise of his First Amendment rights, defendants deprived plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and conspired among themselves to do so (taking numerous steps in furtherance thereof), and failed to prevent one another from doing so.

115.   Defendants discriminated against plaintiff by treating him differently than those similarly situated based on defendants' intent to inhibit and/or punish plaintiff for his exercise of his constitutionally protected right to free speech and/or based on defendants' malicious or bad faith intent to injure Plaintiff.

116.   By singling out plaintiff for unequal, retaliatory and vindictive treatment, defendants deprived plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution.

117.   In addition, upon information and belief, defendants conspired among themselves to deprive plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourteenth Amendment to the United States Constitution, and took numerous overt steps in furtherance of such conspiracy, as set forth above.

118.   Defendants acted under pretense and color of state law in their individual and official capacities and within the scope of their respective employments as DOC employees. Said

28

acts were beyond the scope of defendants' jurisdiction, without authority of law, and an abuse

of their powers, and said defendants acted willfully, knowingly, and with the specific intent

to deprive plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the

Fourteenth Amendment to the United States Constitution.

119.   By singling out plaintiff for retaliatory, vindictive and unequal treatment with the intent to

suppress and/or chill his constitutionally protected activities and/or to maliciously injure him,

defendants violated plaintiff's Fourteenth Amendment rights.

120.   a direct and proximate result of the misconduct and abuse of authority detailed above,

plaintiff suffered and continues to suffer actual damages, in forms including but not limited

to lost income, lost future earnings and mental anguish, pain and suffering.


## ELEVENTH CLAIM FOR RELIEF

121.   Plaintiff repeats and realleges paragraphs "1" to "120" as if the same were fully set forth at

length herein.

122.   By their conduct and under color of state law, it is believed that defendants each had

opportunities to intercede on behalf of plaintiff to prevent the retaliation, but, due to their

intentional conduct or deliberate indifference, declined or refused to do so, in violation of 42

U.S.C. § 1983.

123.   As a direct and proximate result, plaintiff suffered the injuries and damages described above.

## TWELFTH CLAIM FOR RELIEF

124.   Plaintiff repeats and realleges paragraphs "1" to "123" as if the same were fully set forth at length herein.

125.   Defendants denied plaintiff the opportunity to take unpaid leave from work for his serious health condition that caused him to be unable to perform his work, in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. 2601 et seq.

126.   As a direct and proximate result, plaintiff suffered the injuries and damages described above.


WHEREFORE, plaintiff respectfully prays for judgment in his favor against defendants as follows:

1.   Declaring that defendants' acts complained of herein violated Plaintiff's rights as secured by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq., 42 U.S.C. §1983, Article I Sections 8 and 11 the New York State Constitution, the New York Human Rights Law, as codified in New York Executive Law §290 et seq., Title 8 of the Administrative Code of the City of New York; and the Family and Medical Leave Act of 1993, 29 U.S.C. 2601 et seq.

2.   Awarding plaintiff a money judgment for his damages, including but not limited to, lost wages, lost benefits, other economic damages, shame, humiliation, mental anguish, embarrassment and emotional distress.

3.   Awarding plaintiff punitive damages for defendants' willful and wanton disregard of his rights.

4.   Awarding plaintiff the costs and reimbursements of this lawsuit, his reasonable attorneys'

fees and such other and further additional relief as this Court may deem just and proper.

Dated:        New York, New York
              July 20, 2005


                              KOUSOULAS & ASSOCIATES P.C.
                              Attorneys for Plaintiff
                              41 Madison Avenue, 40th Floor
                              New York, New York 10010
                              (212) 509-2566


              By:     _____
                              ANTONIA KOUSOULAS (AK8701)

31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANDREW SERRA,

Plaintiff,

-against-

THE NEW YORK CITY DEPARTMENT
OF CORRECTIONS ("DOC");
JOHN BIASI, individually and in his capacity
as Provisionary Senior Stationary Engineer of the
DOC; LEE NILES, individually and in his
capacity as Supervisor of Mechanics of the DOC;
CARLISE THOMPSON, individually and in his
capacity as Warden of the DOC; WILLIAM J. FRASER,
individually and in his capacity as Commissioner
of the DOC; MARTIN F. HORN, individually
and in his capacity as Commissioner of the DOC
and THE CITY OF NEW YORK,

Defendants.

## COMPLAINT

*Kousoulas & Associates P.C.*
*Attorneys for Plaintiff*
*41 Madison Avenue, 40th Floor*
*New York, New York 10010*
*212-509-2566*

*Due and timely service is hereby admitted.*

*New York, N.Y. . . . . . . . . . . . . . . . . . . . 2005 . . .*

*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Esq.*

*Attorney for . . . . . . . . . . . . . . . . . . . . . . . .*